Robert C. Olney and Lillian J. Olney, et al. [1] v. Commissioner. Olney v. Commissioner
Docket Nos. 57862, 68760, 68761.
United States Tax Court
T.C. Memo 1958-200; 1958 Tax Ct. Memo LEXIS 24; 17 T.C.M. (CCH) 982; T.C.M. (RIA) 58200; November 28, 1958
*24 The Olney Foundation, Inc., was organized as a nonprofit charitable corporation in 1950 to build and operate a hospital. Plans and construction were started soon afterwards and the hospital commenced operation in December 1952. It was operated on an open-staff basis and did not deny admission to any patient regardless of ability to pay for services. Petitioner Olney, whose resources and effort made it possible to build the hospital, supervised the operation of the hospital as medical director and chairman of the board of trustees. He never received any compensation for his work nor did the other trustees. Since he spent considerable time on hospital affairs and could not find adequate quarters nearby, he, with the consent of the trustees, maintained offices in the hospital for his private medical practice. For the first 2 years of operation the receipts and expenditures of the hospital and Olney were recorded on the same books but when his accountant was able to devote time to accounting affairs the receipts and expenditures were segregated so as to clearly reflect income of both Olney and the hospital. The Commissioner contends that the Foundation rented the hospital to Olney and *25 that the receipts of the hospital, less expenditures, were income to Olney and that the Foundation was not tax exempt under section 101(6), Internal Revenue Code of 1939. Held, for the petitioner. The Foundation operated the hospital and was exempt from tax under section 101(6) of the 1939 Code as a corporation "organized and operated exclusively for * * * charitable * * * purposes." Held, further, that the receipts of the hospital are not to be included in Olney's income. Robert B. Crosby, Esq., and Robert L. Jeffrey, Esq., for the petitioners. Richard C. McLaughlin, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions thereto under sections 291 and 294 of the Internal Revenue Code of 1939, [2] *26 as follows: Robert C. Olney and Lillian J. Olney
Docket No. 57862
Additions to Tax
Defi-
Sec.
Sec. 294
Sec. 294
Year
ciency
291(a)
(d)(1)(A)
(d)(2)
1952
$ 2,661.54
The Olney Foundation, Inc.
Docket No. 68760
1950
3,887.81
$ 971.95
1951
9,009.16
2,252.29
1952
26,451.49
6,612.87
1953
4,688.92
1,172.23
1954
9,161.08
Robert C. Olney and Lillian J. Olney
Docket No. 68761
1953
2,254.84
$462.13
$308.10
1954
3,180.52
371.44
222.87 By amendment to answer in Docket No. 68761, respondent claimed increased deficiencies in income tax and additions thereto under sections 294(d)(1)(A) and 294(d)(2) for the taxable year 1954 in the respective amounts of $1,026.62, $102.67, and $61.59. The deficiency in Docket No. 57862 has been conceded to be correct by petitioners and is not in issue. Respondent concedes that in Docket No. 68761 the addition to tax under section 294(d)(1)(A) for 1953 is inapplicable. In Docket No. 68760, the respondent determined that the Olney Foundation, Inc., did not qualify for tax exempt status for the years 1950 to 1953 under section 101 and for the year 1954 under section 501 of the Internal Revenue Code of 1954. He also determined the amount of net taxable income of the Foundation for the years involved. In Docket No. 68761, the deficiency is based on the respondent's determination that the receipts and expenditures of the hospital for the years 1953 and 1954 were the receipts and expenditures of Robert C. Olney, the organizer of the Olney Foundation, Inc. The primary question involved is whether the Olney Foundation, Inc., *27 is exempt from taxation under section 101(6) as a charitable organization. A number of other questions, some of which are dependent upon the disposition of the primary question, are also presented. Findings of Fact Some of the facts have been stipulated; they are incorporated herein by this reference. Petitioners Robert C. Olney, hereinafter referred to as Olney, and Lillian J. Olney, husband and wife, are residents of Lincoln, Nebraska, and filed their individual Federal income tax returns jointly on the cash basis for the years 1952, 1953, and 1954, with the district director of internal revenue for Nebraska. Petitioner, The Olney Foundation, Inc., hereinafter referred to as the Foundation, a Nebraska corporation, filed corporate income tax returns (Form 1120) for the years 1950, 1951, 1952, and 1953 on September 14, 1954, and for the year 1954 on July 1, 1955, with the district director of internal revenue for Nebraska. The Foundation also filed a Form 990-T for the year 1953 with the same office. Olney is, and has been since 1919 when he graduated from medical school, a licensed physician and surgeon engaged in the practice of medicine in Lincoln, Nebraska. About 1946, he began *28 thinking about forming a charitable foundation to own and operate a hospital. Olney was interested in relieving the acute shortage of hospital beds in Lincoln, in providing a place where all qualified doctors could practice (because, although he was allowed to practice in all three hospitals in Lincoln and was on the attending staff of two of them, many of the younger doctors were restricted in their use of hospital facilities), and in providing a place where medical research could be carried on. Olney sought information regarding his plan from various friends and other persons throughout the country who were interested in similar projects. He retained an attorney, who had a reputation for being an expert in forming charitable trusts to run hospitals, to come down from Minneapolis to assist his local counsel. Since Olney was the principal person interested in the project, it was decided to have three disinterested persons act as incorporators. The three men, George Fleischauer, Steven J. Kortan, and Carl Ganz, were friends of Olney and were sympathetic with his aims, i.e., to establish a nonprofit charitable corporation for the purpose of building and operating a hospital which would *29 provide care for the sick regardless of ability to pay, which would have an openstaff policy (all qualified doctors allowed to practice therein), and which would carry on medical research. On February 6, 1950, the articles of incorporation of the Foundation, which were drawn by Willis Hecht, attorney, were filed with the Secretary of State of the State of Nebraska and provided, inter alia, as follows: "We, [the incorporators] hereby associate ourselves for the purpose of establishing a non-profit corporation under and pursuant to the laws of the State of Nebraska, relative to social, charitable educational, and scientific corporations, and do hereby adopt the following articles of incorporation: * * *
"ARTICLE III "The objects and purposes of this corporation shall be to purchase, lease, own, acquire, and mortgage such medical, surgical, and dental facilities and/or equipment essential, necessary, or desirable in connection with the establishment, maintenance, and operation of clinical, pathological, medical, surgical, research, and other laboratories, as well as of hospitals, for the care and treatment of those in need of medical, surgical, or other related aid or attention; to afford *30 instruction and opportunity for research in all branches of medicine and surgery; to purchase, lease, acquire, mortgage, pledge, or otherwise deal in and with real and personal property essential to the carrying out of the foregoing purposes; to take real or personal property of any and every nature by gift, bequest, or devise and to use, retain, sell, or dispose of the same; to invest corporate funds or the proceeds of the sale of corporate property in interestbearing securities, promissory debt obligations, notes, bonds, mortgages, or debentures, or in preferred or common stocks selected by the Board of Trustees. "ARTICLE IV "The incorporators shall constitute the original membership of the corporation, and further membership shall be effected by election by the unanimous vote of the existing members. No stated membership fee or contribution shall be required of a member. * * * "ARTICLE V "The existence of this corporation shall be from the filing of these articles as provided by law and shall be perpetual. "ARTICLE VI "The property and affairs of the corporation shall be managed and controlled and its transactions conducted by a Board of Trustees consisting of three persons who *31 shall be members of the corporation and who shall be elected for a term of one year at the annual meeting of the members of the corporation. The annual meeting of the members of the corporation shall be held in the City of Lincoln, State of Nebraska, on the third Wednesday of January in each year. The officers of the corporation shall be a medical director, a secretary, and a treasurer, to be elected by the Board of Trustees, and which said officers shall hold office and serve until their successors are elected and qualified. Said officers may but need not be members of the corporation, and one or more of the offices specified may be held by the same person. "ARTICLE VII "The private property of the incorporators, members, or trustees of this corporation shall not be subject to the payment of corporate debts to any extent whatever, nor shall any incorporator, member, or trustee be personally liable in connection with the management, investments, or other affairs of the corporation, except for fraud or gross negligence. "ARTICLE VIII "The corporation shall have no capital stock and shall declare no dividends, and none of the income therefrom may accrue to the benefit of any of its *32 members, trustees or incorporators. * * * "ARTICLE X "This corporation may be dissolved in such manner as provided by law or as may be directed by a court having jurisdiction of its dissolution proceedings and, after payment of all debts and obligations which may be against it, all remaining property of the corporation shall be donated to such other charitable trust as the then Board of Trustees so serving shall determine." Bylaws which generally conformed to the charter were adopted at the first meeting of the incorporators. Within 2 weeks of the filing of the articles of incorporation, Hecht, Olney, and Ganz were selected as the board of trustees. The trustees, pursuant to the avowed purposes of the Foundation, began formulating plans for the establishment of a hospital which they intended to finance through the sale of bonds and donations. Olney invited the local doctors to a meeting where he outlined his plans and asked for their support. At the time of, and for a number of years prior to, the organization of the Foundation Olney practiced medicine, in association with a group of doctors, in a building located at 800 South 13th Street in Lincoln. The building and the group were *33 called The Olney Clinic, hereinafter sometimes referred to as the Clinic. Olney owned the building and the land. On March 1, 1950, Olney conveyed the Clinic building, land, and equipment to the Foundation. The Foundation did not pay Olney therefor but a loan payable to him was recorded on the books of the Foundation in the amount of $54,770.13, which was equal to his adjusted basis. The Clinic was rented to Olney by the Foundation from the date it was conveyed to the Foundation until December 15, 1952. For the use of the Clinic the rental to be charged Olney by the Foundation was based on rentals in Lincoln for similar facilities. Olney made rental payments to the Foundation for the use of the Clinic which were deducted on his individual returns as business expenses, as follows: 1950 (from March 1)
$ 8,286.16
1951
31,073.10
1952 (to December 15)
30,073.33 Checks totaling the above amounts were drawn by Lois Horn, hereinafter referred to as Lois, Olney's secretary, on the Clinic bank account and deposited in the Foundation bank account. Also, on March 1, 1950, Olney donated to the Foundation an apartment house which had an adjusted basis to him of $11,406.25. The Foundation sold this property *34 on September 9, 1950, for $26,500, and after deducting the expenses of sale, realized a gain of $13,611.80 (proceeds less adjusted basis). About April 3, 1950, a large tract of land, located in a residential district in Lincoln at 901 South 48th Street, was conveyed to the Foundation by third parties for $30,000. To finance this purchase, Olney loaned the Foundation $30,000. A portion of the tract was sold to home builders and about 11 acres were retained for the purpose of building a hospital thereon. Architects were retained to draw the plans but because of various difficulties construction was not commenced until the latter half of 1951. In 1951, a $900,000, 4 per cent, first mortgage, 25-year bond issue was prepared and Robin Reid, a retired judge, was retained to manage it. The trustees set a sales goal of $400,000. Although the bonds were well advertised, sales only reached about $20,000 which fell far short of the goal. Donations were also disappointing; aside from Olney's donation, a gift of $1,000 in 1951 was the only donation received. To provide the Foundation with the funds necessary to continue construction, Olney loaned the Foundation about $80,000 (in addition to the *35 $30,000 which he advanced to finance the purchase of the land). He procured these funds through bank loans and sales of securities. Although construction was not entirely completed, the hospital was ready for occupancy on December 15, 1952. When completed the physical plant was a 3-story brick building with basement 160 feet long and 44 feet wide and contained about 60 to 65 beds. The cost of the physical plant was about $380,000 and the cost of equipment nearly $100,000. Prior to completion of the hospital, a medical director had been hired. However, he was incompetent and it was decided that Olney would act as medical director, without pay. In order to perform his duties as chairman of the board of trustees and as medical director he was required to spend considerable time at the hospital. Olney attempted to rent office quarters near the hospital. Being unable to locate adequate quarters, he entered into an understanding with the other trustees allowing him to occupy three rooms in the hospital for his private office. He moved into the hospital on December 15, 1952, when it was ready for occupancy, and occupied these rooms until sometime after 1954, when he moved to a newly constructed *36 building across from the hospital. The Foundation sold the Clinic immediately (on December 16, 1952) for $115,000, realizing a gain of $76,370.68. The proceeds provided funds which were greatly needed to pay creditors for construction work and equipment. However, an additional $115,000 was still due to creditors. Negotiations with various creditors resulted in many of the creditors agreeing to accept monthly installment payments of the amounts due. It was estimated that about $5,000 per month would be needed to meet the installment obligations. At the time the hospital opened, Olney was extremely busy moving from the Clinic, supervising the opening of the hospital, and attending to his own practice. His accountant, R. L. Jeffrey, a certified public accountant and attorney, had been recalled to active duty with the Air Force in 1951 and had been released only shortly before the hospital opened. Jeffrey and his staff were extremely busy and could not attend to the bookkeeping and accounting affairs of Olney and the hospital. In this state of rush and confusion, Olney, who did not have the time to attend to, or have any knowledge of, bookkeeping and accounting procedures, has his office *37 staff carry over the bookkeeping system from the Clinic to the hospital. The name of the Clinic bank account was changed to "The Olney Clinic-Hospital" account on December 3, 1952. In addition, many of the patient cards were carried over from the Clinic to the hospital. The charges to patients of both Olney and the hospital were entered on the same patient card. One bill containing charges of Olney and the hospital was sent to each patient. The receipts representing payment for both the hospital's and Olney's charges were deposited in the Clinic-hospital bank account. The operating expenses of both Olney and the hospital were paid from the Clinic-Hospital account. In order to make the agreed monthly payments to creditors Olney instructed Lois to transfer any surplus funds from the Clinic-Hospital bank account to the Foundation bank account and to make the payments from the latter. Lois knew that the Foundation was required to make payments of approximately $5,000 per month. The following amounts were drawn on the Clinic-Hospital bank account and deposited in the Foundation bank account: Amount of
Date
Check
Notation on Check
12/31/52
$2,500.00 [1]
Rent 12/15 to 12/31/52
1/ 8/53
2,500.00
On Rent Begin. 1/1/53
1/21/53
2,500.00
Rent Jan. 15 to Jan. 31
3/ 4/53
2,500.00
Not marked
3/ 7/53
1,000.00
On Feb. Rent
3/30/53
1,500.00
Bal. of Feb. Rent
4/11/53
1,000.00
On March Rent
5/ 2/53
4,000.00
Rent to April 1
5/13/53
500.00
Not marked
7/ 3/53
1,100.00
Rent
7/23/53
1,500.00
Rent - April
8/ 5/53
2,000.00
Rent
9/ 1/53
500.00
Not marked
9/ 8/53
1,800.00
Not marked
10/12/53
3,100.00
Not marked
12/ 9/53
1,500.00
Rent on June
1/ 5/54
1,700.00
June Rent
1/13/54
250.00
Not marked
2/ 6/54
1,950.00
Not marked
2/26/54
1,000.00
Not marked
3/ 4/54
1,500.00
Not marked
4/ 5/54
2,000.00
Rent
4/16/54
3,000.00
Not marked
5/ 3/54
2,000.00
Not marked
5/17/54
3,000.00
Not marked
6/ 3/54
2,000.00
Not marked
6/15/54
3,000.00
Not marked
7/ 2/54
2,000.00
Not marked
7/15/54
3,000.00
Not marked
8/ 4/54
2,000.00
Not marked
8/16/54
3,000.00
Not marked
9/ 1/54
2,000.00
Not marked
9/15/54
3,000.00
Not marked
11/ 1/54
2,000.00
Not marked
*38 The above checks which were marked "Rent" were so marked by Lois, mainly because that is the manner in which she had marked checks to the Foundation prior to the opening of the hospital. She had not received instructions from anyone to mark them "Rent" and no agreement was ever entered into between Olney and the trustees which called for rent in the above amounts. In addition to the above checks which transferred funds from the Clinic-Hospital account to the Foundation account, checks in the amounts of $672.30 in 1953 and $12,385.57 in 1954 were drawn on the Clinic-Hospital account to the order of certain creditors of the Foundation in payment of obligations incurred during the building and equipping of the hospital. The total of the above checks plus other payments from the Clinic-Hospital account to or on behalf of the Foundation were as follows: 1952
1953
1954
Checks
$2,500.00
$27,000.00
$38,400.00
Other
672.30
12,385.57
$2,500.00
$27,672.30 [1]
$50,785.57 Olney, on his 1952 return which was *39 prepared by his accountant Jeffrey, reported all of the receipts and expenses of his own practice, plus any operating receipts and expenses of the hospital for the period December 15, 1952, to December 31, 1952. On his 1953 return, which Olney prepared himself, he reported all the operating receipts and expenses of his own practice and the hospital. Olney's returns for 1952 and 1953 showed the following: 1952
1953
Receipts
$129,730.75
$249,495.16
Expenditures
115,865.81 [1]
249,912.78 [2]
Net profit or loss
$ 13,864.94
$ (417.62)
In 1954, Jeffrey and his staff finally were able to devote some time to Olney's and the Foundation's accounting and bookkeeping affairs. A complete and detailed analysis was made of all of the receipts and expenditures that passed through the Clinic-Hospital bank account for the period December 15, 1952, *40 when the hospital was opened, until November 1, 1954. In addition all of the patient cards were analyzed. All of the receipts from hospital charges were transferred to the Foundation's books and the receipts from Olney's own practice were regarded as his. All of the expenses were allocated upon a fair and a reasonable basis so that the net income of both the hospital and Olney would be clearly reflected. It was decided that Olney should be charged with rent for the three rooms used for his private practice at the rate of $400 per month, and this was reflected in the allocation. For the last 2 months of 1954 the receipts and expenditures of the hospital were kept separate and apart from Olney's receipts and expenditures. On April 12, 1956, Olney filed an amended 1953 return prepared by Jeffrey. On June 16, 1955, Olney filed his return for 1954, prepared by Jeffrey. These returns reflected Olney's share of receipts and expenses of the Clinic-Hospital account, as determined by the accountant's allocation, and showed the following: 1953
1954
Receipts
$59,472.76
$47,881.77
Deductions
44,596.52
42,113.45
Net Profits
$14,876.24
$ 5,768.32 During the periods involved, the Foundation made application *41 to the respondent for exemption from taxation under section 101 (6). Prior to the opening of the hospital, the granting of exempt status was deferred on the ground that the Foundation was merely renting property and it would have to operate the hospital for a period before exempt status could be determined. The Foundation filed corporate returns (Form 1120) for the years 1950 to 1953 on September 14, 1954, and for the year 1954, on July 1, 1955. In all of the spaces on those returns for amounts entering into the computations of gross income, deductions, net income, and income tax there were entered zero (-0-). The respondent, on April 15, 1957, by a notice of deficiency, determined that the Foundation "did not qualify as an exempt organization under the provisions of section 101" for the years 1950 to 1954, inclusive. Further, he determined that the Foundation had taxable net income as follows: Year
Amount
1950
$16,903.52
1951
27,253.90
1952
98,323.98
1953
15,644.07
1954
28,194.38
The determination was based on the theory that Foundation did not operate the hospital but was renting it to Olney and that its income consisted of rents (payments for use of the Olney Clinic to December 15, 1952; and *42 after December 15, 1952, the funds transferred from the Clinic-Hospital account to or on behalf of the Foundation, see Findings of Fact, supra), and gains from the sale of property. The respondent, on April 17, 1957, by a notice of deficiency, determined that Olney had additional business income for the years 1953 and 1954, as follows: 1953
1954
Reported
$14,876.24
$ 5,768.32
Add
6,478.83
12,645.19
Total
$21,355.07
$18,413.51
For the year 1954, the respondent, by amendment to his answer, asserted that Olney had additional net income from patient receipts of $3,961.32. The following schedule reflects the agreed upon income and expenses of the Foundation for the years 1950 and 1951: 1950
1951
Income: Rents (from Clinic)
$ 8,286.16
$31,073.10
Operating Expense
5,758.16
4,750.93
Net Operating Income
$ 2,528.00
$26,322.17
Other Income: Gains from sale of Prop-
erty
13,611.80
Net Income
$16,139.80
$26,322.17
The following schedules reflect income and expenses as shown by the Clinic-Hospital bank account, the income and expenses of Olney and the Foundation as now claimed by the petitioner after the accountants' allocation, and the adjustments thereto and net income as now contended by the respondent (figures in parentheses *43 indicate minus): Total per
Clinic-Hospital
Olney [1]
Foundation
Acct.
1952
Per Petitioners: Patient Receipts 1/1-12/15/52
$133,867.30
$133,867.30
Patient Receipts 12/15-12/31/52
3,107.95
$ 544.85
3,652.80
Total Patient Receipts
$136,975.25
$ 544.85
$137,520.10
Oper. Exp. excl. rent & other
82,576.25
791.49
83,367.74
Net Inc. before rents & other Foundation exp.
$ 54,399.00 (246.64)
$ 54,152.36
Rent 1/1-12/15/52
(30,037.33)
30,037.33
Rent
(200.00)
200.00
Other Foundation expenses
(8,596.36)
Net Income Per Petitioners
$ 24,161.67
$ 21,394.33
Adjustments by Respondent: Patient Receipts
544.85
(544.85)
Expenses of Clinic-Hospital
(791.49)
791.49
Excess Dep'n. on Foundation Assets
121.86
Rent Adjustment
(2,300.00)
(200.00)
Net Income Per Respondent
$ 21,615.03
$ 21,562.83
1953
Per Petitioners: Patient Receipts
$ 59,472.76
$189,993.40
$249,466.16
Oper. Exp. excl. rent & other
42,332.67
164,149.37
206,482.04
Net Inc. before rents & other Foundation exp.
$ 17,140.09
$ 25,844.03
$ 42,984.12
Rents
(4,800.00)
4,800.00
Other Foundation expenses
(23,874.85)
Net Income Per Petitioners
$ 12,340.09
$ 6,769.18
Adjustments by Respondent: Patient Receipts
189,993.40
(189,993.40)
Expenses of Clinic-Hospital
(164,149.37)
164,149.37
Excess Dep'n. on Foundation Assets
3,906.31
Additional Dep'n. per concession on brief
(105.22)
Rent Adjustment
(26,499.37)
28,999.37
Net Income Per Respondent
$ 11,684.75
$ 13,725.61
1954
Per Petitioners: Patient Receipts
$ 44,767.72
$253,466.19
$298,233.91
Oper. Exp. excl. rent & other
37,739.27
188,195.50
225,934.77
Net Income
$ 7,028.45
$ 65,270.69
$ 72,299.14
Rents
(4,800.00)
4,800.00
Other Foundation expenses
(28,323.28)
Accrued Interest Income
228.32
Net Income Per Petitioners
$ 2,456.77
$ 41,747.41
Adjustments by Respondent: Patient Receipts
253,466.19
(253,466.19)
Expenses of Clinic-Hospital
(188,195.50)
188,195.50
Excess Dep'n. on Foundation Assets
3,906.31
Additional Dep'n. per concession on brief
(105.22)
Interest Income and Expense
(228.32)
228.32
Accrued Payroll Taxes
794.32
Rent Adjustment
(45,985.57)
45,985.57
Net Income Per Respondent
$ 21,513.57
$ 27,286.02
*44 It is agreed that the Foundation realized additional income from the sale of property as follows: Year
Amount
1952
$76,370.68
1953
107.50
From his office in the hospital Olney carried on his private practice in addition to carrying on his duties as medical director and chairman of the board of trustees. He devoted considerable time, effort, and services to the latter two positions. Olney never received any compensation for his services as medical director of the hospital. Neither Olney nor the other trustees ever received any compensation for their services as trustees of the Foundation nor did they receive any earnings of the hospital. At December 15, 1952, there was approximately $5,000 in the Clinic-Hospital bank account which belonged to Olney and which was not drawn out by him. Net earnings of Olney, after allocation, for the years 1953 and 1954 in the respective amounts of $12,340.09 and $2,228.45 ($2,456.77 less $228.32 accrued net income) were reflected in that same bank account. From December 15, 1952, until November 1, 1954, *45 Olney withdrew from that account for personal use the amounts of $5,450 and $11,951.08. At November 1, 1954, when the books of Olney and the Foundation were made separate, the balance in the Clinic-Hospital account was placed in the Foundation bank account. The hospital was open to all doctors from the time it commenced operation. During the first 6 months of operation 19 doctors used the facilities. From the time that the hospital opened until the end of 1957, 63 doctors used the facilities. Medical research in various fields was conducted at the hospital with some noteworthy results being achieved. The hospital has not denied admission to any patient because of inability to pay or because of race, color, or creed from the time it commenced operation. When a patient would apply for admission no investigation was made regarding his ability to pay. Some patients were known to be unable to pay at the time they were admitted. In most cases the patient's ability to pay was determined after the services had been performed. Many patients would only pay a portion of the amount they were charged. For the period December 15, 1952, to the end of 1954 approximately $25,000 of services, based *46 on the standard fees charged, was rendered to approximately 1,200 outpatients unable to pay. For the period December 15, 1952, through May 1957, over $55,000 of services was rendered to about 200 inpatients (plus the families of some of them) unable to pay. [3] To some extent these amounts included amounts for Olney's services. The hospital, during the period December 15, 1952, to December 31, 1954, was operated on a charity basis to the extent of its financial ability. The original name of the hospital was Doctors Hospital. After a complaint from a group of persons in Omaha, Nebraska, who operated a hospital with the same name, the name was dropped and it was called Olney Hospital for a short while until a suitable name could be found. After the years in question the name "Providence Hospital" was adopted. During the years in question the Foundation was organized and operated exclusively for charitable purposes and no part of its net earnings inured to the benefit of any private shareholder or *47 individual. Olney filed a timely "Declaration of Estimated Tax" (Form 1040 ES) for the year 1953. The amount of tax estimated thereon was zero (0). Olney did not file a "Declaration of Estimated Tax" for 1954. Olney relied generally on Jeffrey, a certified public accountant and attorney and a qualified tax counsel, for all income tax and accounting matters. Olney did not rely upon Jeffrey in preparing and filing his 1953 return on March 15, 1954. Olney's failure to file a declaration of estimated tax for 1954 was not due to reasonable cause but was due to wilful neglect. Opinion BLACK, Judge: Respondent has denied that the Foundation is exempt from taxation under section 101(6) and section 501(c)(3), Internal Revenue Code of 1954, [4] *48 and has determined deficiencies in income tax and additions thereto against it for the years 1950 to 1954 and against Olney, whose resources and efforts were primarily responsible for its organization and operation, for the years 1953 and 1954. Since the questions involving Olney's taxes are to a great extent dependent upon the resolution of the questions concerning the Foundation, we shall first consider the questions regarding the Foundation. The Foundation claims that it is a tax exempt charitable corporation under section 101(6). [5] *49 In order to prevail it must meet three tests, viz: "(1) It must be organized and operated exclusively for [charitable] * * * purposes; "(2) Its net income must not inure in whole or in part to the benefit of private shareholders or individuals; and "(3) It must not by any substantial part of its activities attempt to influence legislation by propaganda or otherwise. [Regulations 111, Section 29.101(6)-1; Regulations 118, Section 39.101(6)-1.]" Respondent concedes that the Foundation meets the third test and, although the respondent argues in the alternative that some of the Foundation's net earnings inured to Olney's benefit, it is clear that on the record here it would not be proper to make a finding to that effect or to the effect that the Foundation does not meet the second test. [6] *50 Thus, the question is whether the Foundation was "organized and operated exclusively for * * * charitable * * * purposes." "Corporations organized and operated exclusively for charitable purposes comprise, in general, organizations for the relief of the poor." Regulations 118, section 39.101(6)-1(b). Although one noncharitable purpose, if substantial in nature, will render the exemption unavailable, cf. Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279, 283 (1945), it is recognized that the receipt of voluntary contributions from *51 the persons intended to be relieved will not necessarily deprive the organization of its exemption. Regulations 118, section 39.101(6)-1(b). It is pursuant to this latter principle that hospitals which do not deny admission to any person because of inability to pay, and charge for services, except when a person is unable to pay, are included under the aegis of section 101(6). See Commissioner v. Battle Creek, 126 Fed. (2d) 405 (C.A. 5, 1942), [7] affirming Memorandum Opinion of Board of Tax Appeals. The Commissioner, in a recent ruling (Rev. Rul. 56-185, C.B. 1956-1, p. 202) [8] states the concept clearly: "2. It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced *52 rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered." It is obvious from its charter and the evidence aliunde, and the respondent does not contend otherwise, that the Foundation was organized for the above-described purposes. The question is therefore narrowed *53 to whether the Foundation was so operated. From the time of its organization in 1950 until December 15, 1952, the only substantial activity of the Foundation was the planning and construction of a hospital. The Foundation needed funds in order to pursue that activity. It raised the needed funds in the following ways: (1) Olney donated an apartment house which was sold shortly thereafter for $26,500; (2) a single gift of $1,000 was received from the public; (3) it authorized a $900,000 first mortgage bond issue but only sold bonds in the amount of about $20,000; (4) Olney conveyed the Clinic to Foundation for an amount equal to his adjusted basis but the Foundation did not pay him this amount during the years in question; (5) the Foundation rented the Clinic to Olney for the period March 1, 1950, to December 15, 1952, for a total rental of $69,396.59 and on December 16, 1952, sold the Clinic at a gain of $76,370.78; (6) Olney loaned the Foundation $30,000, which was not repaid during the years in question, to purchase the land for the hospital site; and (7) Olney loaned the Foundation about $80,000 additional, which was not repaid during the years in question. (He procured these funds *54 from bank loans and sales of securities.) On these facts, the respondent contends that for the period from organization until December 15, 1952, a principal activity of the Foundation was "the management and sale of income-producing property"; that "no benefit flowed to the public" from these activities and that therefore "the Foundation was [not] operated exclusively for charitable purposes." We disagree. The conversion of donated property into cash cannot be deemed a principal activity or purpose. Nor, in the context of the case, can the renting of the Clinic to Olney be so considered. Cf. Alan Levin Foundation, 24 T.C. 15, 20 (1955). By renting the Clinic until the liabilities for construction were due, it appears that the Foundation realized substantially (mainly through rents) more than would have been realized by a sale in 1950 when it acquired the Clinic. The funds derived from these sales and rentals were being used to build the hospital, the avowed nature of which was to be charitable. Without these funds it is doubtful if the hospital could have been built at all. The fact that the hospital was not completed during these years and therefore could not actively dispense charity *55 is not fatal. Cf. Alan Levin Foundation, supra.It accumulated whatever earnings it had from rentals and sale of property in the form of a hospital for the purpose of dispensing charity when the hospital was completed. For the period December 15, 1952, when the hospital commenced operation, until the end of 1954, the end of the period here involved, the issue presented is quite different. Although the respondent attacks the charity lists submitted by the Foundation as inaccurate, it is clear that the hospital dispensed substantial charity and clearly is within the principles set out in Rev. Rul. 56-185, supra. However, the respondent contends that Olney rented the hospital from the Foundation and operated it himself; he argues that therefore the Foundation was in the rental business and was not operated exclusively for charitable purposes. Clearly, if Olney did rent the hospital the respondent's conclusion is correct. And the question of whether he rented the hospital is a question of fact to be derived from the evidence. Petitioners rely on the testimony of Olney, his secretary, and the other trustees, all of which was clearly to the effect that Olney did not rent the hospital, *56 but only rented and occupied three rooms of the hospital under the circumstances explained in our Findings of Fact. Respondent, on the other hand, relies on certain inferences drawn primarily from the manner the records of the hospital and Olney were kept. Respondent's argument can be summarized (from his brief) as follows: "From December 15, 1952 to approximately November 1, 1954, receipts from patients for services rendered by the hospital were deposited, along with the receipts from the Doctor's professional practice, in the same bank account, which account had been for many years the Doctor's business account. Furthermore, the expenses of operating the hospital as well as those of the Doctor's professional practice were paid out of this bank account. The income and expense of both the Doctor's practice and the operation of the hospital were recorded on the same books. Patients of the Doctor and hospital received a single statement for the charges of both. Furthermore, from the opening of the hospital through 1954 and later, the Doctor has maintained his office for the practice of medicine in the hospital. * * * when such facts are coupled with other facts which show that the Doctor *57 reported the income and expenses of both his professional practice and the operation of the hospital on his original 1953 return, thatthe forms 990 prepaid for the Foundation for 1952 and 1953 show no receipts from patients and no expense for operating a hospital, and that the Doctor paid rent to the Foundation for the use of the hospital, it can only be concluded that the Doctor and not the Foundation was operating the hospital. * * *" The fact that joint books and records were used is plausibly explained, we think, by the situation which existed when the hospital commenced operation. A state of rush and confusion existed at that time; Olney had to move from the Clinic to the hospital and had to supervise the operation of the hospital. He was not qualified to set up adequate books and records nor did he have the time to do so. The accountant upon whom he relied had just recently returned from the Air Force after having been recalled to duty during the Korean War. The checks drawn on the Clinic-Hospital account to the order of the Foundation, some of which were marked rent, cannot fairly be called rental payments in the face of the evidence. Many of them were not market rent. Regarding *58 the checks which were marked rent, the secretary explained that she did this because she did not know how else to mark them and had previously marked the Clinic checks to Foundation in that manner. But the record clearly shows that neither Olney nor the other trustees instructed her to mark checks representing a transfer of funds in that manner. The only thing that we can conclude from the notations on the checks and from the recording of these transferred funds as rent is that the secretary and Olney were poor bookkeepers. In addition, the amounts actually paid do not substantiate the respondent's theory of $5,000 rent per month. It appears that there was no understanding regarding rent, either for $5,000 per month as respondent contends, or $400 per month as petitioners contend, until the accountant analyzed the books and allocated expenses. When we view the entire record in this case and especially the testimony of Olney, his secretary, and the other trustees, we think the only reasonable conclusion that can be reached is that Olney was not renting the hospital. We think that the Foundation, with Olney working as its medical director and trustee (without compensation), operated *59 the hospital. Since the Foundation operated the hospital, and since the hospital was charitable, we think that the Foundation was "operated exclusively" for charitable purposes within the meaning of section 101(6) and was exempt from taxation. See Commissioner v. Battle Creek, supra. The instant case is distinguishable on its facts from the recent case of The Lorain Avenue Clinic, 31 T.C. - (October 23, 1958), where we held that the taxpayer was not organized and operated exclusively for charitable purposes; that part of its net earnings inured to the benefit of private individuals and that it was therefore not exempt from taxation under section 101(6). In that case a small family group organized and controlled the taxpayer, which owned and operated a medical clinic. A group of doctors and dentists, associated by contract with the taxpayer, practiced medicine at the clinic for profit. Substantially all of the net earnings were distributed to the associated doctors. No records of charity patients were introduced and the testimony relating to charitable patients was vague. We concluded that the taxpayer was "operated for profit by a small family group; that the operations for profit *60 were petitioner's predominant activity, and that such charitable services as were rendered by the associated physicians were occasional and of too minor volume to qualify petitioner for exemption under section 101(6). [Citing cases.]" On the other hand, in the instant case no net earnings of petitioner inured to the benefit of any private individual and the hospital had numerous charity patients and was operated on a charitable basis to the extent of its financial ability. Regarding Olney's personal taxes for the years 1953 and 1954, we think the allocation made for the years 1953 and 1954 by his accountant [9] *61 should be used in determining his income, except that the accrued interest income of $228.32 at the end of 1954 should not be included in his income since he is on the cash basis. Also, for the same reason the payroll taxes allocated to Olney are only deductible to the extent that they were paid as of December 31, 1954. Respondent argues that the petitioners' accountant's "allocation strains all recognized concepts of income tax reporting." However, it is clear that the gross receipts were derived by two separate entities, the Foundation and Olney, and were, as nearly as possible, segregated according to who earned them. The expenses of Olney were clearly paid from the "Clinic-Hospital account" which included some of his funds. And the allocation, we think, reflected the amount paid for his expenses. The allocation, therefore, reflects Olney's income. That is the object of the statute. See section 41. The fact that the allocation is made subsequent to the time the transactions which are reflected occurred, of course, is not desirable. Better bookkeeping should have been used from the very start. There is no doubt about that. But such allocation is necessary in circumstances where the affairs of two or more entities are confused. In many cases the Commissioner, with good reason, does the very thing that he here condemns. The taxpayer in this case may also fairly plead that he should not be bound by the form of his records. Compare Commissioner v. R. J. Reynolds Tobacco *62 Co., - Fed. (2d) - (C.A. 4, October 6, 1958). [10]
The only other question is whether Olney's failure to file a declaration of estimated tax for the year 1954 was due to reasonable cause and not to wilful neglect. It has been shown that Olney generally relied on Jeffrey, a qualified tax counsel, for income tax matters. However, the record shows that Olney prepared his own 1953 return and filed it on March 15, 1954, the same date the declaration of estimated tax was due. In these circumstances, it does not seem reasonable to conclude that he relied upon Jeffrey for the 1954 declaration of estimated tax while relying upon himself for the 1953 income tax return. Therefore, since we cannot say that he relied upon competent counsel in not filing this specific form, we must hold that he has not shown that his failure was due to reasonable cause and not to wilful neglect. This addition and the additions under section 294(d)(2), if any, can be computed *63 under Rule 50. Decision will be entered for the respondent in Docket No. 57862. Decision will be entered for the petitioner in Docket No. 68760. Decision will be entered under Rule 50 in Docket No. 68761. Footnotes
1. The following proceedings are consolidated herewith: The Olney Foundation, Inc., Docket No. 68760, and Robert C. Olney and Lillian J. Olney, Docket No. 68761.↩
2. All section references are to the Internal Revenue Code of 1939 except where otherwise noted.
1. Not deposited in the Foundation bank account until January 8, 1953.↩
1. The record indicates that an additional amount of $6,127.07 was transferred from the Clinic-Hospital account to the Foundation account.↩
1. Includes an item labeled rent of $32,537.33 composed of $30,037.33 paid by Olney to the Foundation for use of the Clinic from January 1 to December 15, 1952, and $2,500 paid to the Foundation by a check drawn on the Clinic-Hospital account on December 31, 1952, supra, ↩
2. Includes as rentals the amounts transferred from the Clinic-Hospital account to the Foundation account.↩
1. As stated in our preliminary statement, Olney's taxes for the year 1952 are no longer in issue. This table is included merely for clarification and comparison.↩
3. The record does not show the number of patients who received entirely free treatment nor does it show the percent of the total charge paid by the patient who paid only a portion of the charge.↩
4. Section 501(c)(3)of the 1954 Code, insofar as here involved, is essentially similar to section 101(6), 1939 Code. (The additional requirement of section 501(c)(3) regarding participation in political campaigns is clearly not involved here.) For convenience, therefore, only section 101(6)↩ will be referred to despite the fact that it is not applicable to the taxable year 1954.
5. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. * * * the following organizations shall be exempt from taxation under this chapter - * * *
(6) Corporations, * * * organized and operated exclusively for * * * charitable, * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *
6. Besides not drawing any salary for his considerable services and efforts as medical director, Olney only withdrew $17,401.08 from the Clinic-Hospital account which amount was less than the amount belonging to him. See Findings of Fact, supra. Also, Olney and the trustees never received any dividends, compensation, or earnings in any form for the work as trustees and under the charter they could never receive any of the Foundation's earnings, even upon dissolution. On the other hand, Olney donated and lent considerable of his private means to the Foundation so that it could achieve its purpose. Respondent, however, contends that the hospital's earnings inured to Olney's benefit because he exercised control of its funds and that he derived substantial benefit from his occupancy of 3 rooms in the hospital. Regarding the former, it appears that he controlled the funds as medical director of the hospital, not in his individual capacity. Regarding the latter, it appears that his net income decreased while he practiced in the hospital, probably because he devoted considerable time to the hospital's affairs. Also, it must be noted that the hospital was not used exclusively by Olney or for his benefit, but that it had an open-staff policy as required by Rev. Rul. 56-185↩, C.B. 1956-1, pp. 202, 203.
7. In that case the court stated (at p. 406): "* * * It is also usual for hospitals and sanitariums to charge those able to pay for services rendered, in order to pay the expenses of the institution, while not denying treatment to others unable to pay anything. Such institutions are classed as charitable. * * *" ↩
8. This ruling interprets section 501(c)(3), 1954↩ Code, but, as stated in Footnote 4, supra, the applicable provisions of the 1939 Code, insofar as here concerned, are substantially similar.
9. The deficiency or overpayment of Olney's taxes for 1953 and 1954 can be determined under Rule 50 in accordance with the stipulation (Exhibits 19-Q and 20-R with cash basis exceptions noted above). As far as can be determined from the record there are no other questions regarding Olney's income.
10. In this case in regard to a problem not wholly dissimilar, the court stated: "Often, and with good reason, the Commissioner pleads for the courts to look through form to substance. In this instance the taxpayer may fairly make the same plea."↩